UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA MARTINELLI,
an individual,

    Plaintiff,

v.

CVS/PHARMACY #8028, an assumed
name for ARBOR DRUGS, INC., a
Michigan corporation,

    Defendant.
_____/

Case No. 04-73738

Honorable Patrick J. Duggan

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan on May 24, 2006.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                     U.S. DISTRICT COURT JUDGE

On April 6, 2005, Plaintiff Brenda Martinelli filed a First Amended Complaint alleging that her former employer, CVS/Pharmacy #8028, terminated her in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MICH. COMP. LAWS ANN. § 37.1102 *et seq.* Presently before the Court is Defendant CVS's Motion for Summary Judgment, filed on January 23, 2006. The Court heard oral arguments on the Motion on April 27, 2006. For the reasons set forth below, Defendant's Motion shall be

granted.

I.  **Factual Background**

On July 19, 1999, Plaintiff was hired at CVS store #8028, in Southgate, Michigan, as a shift supervisor. Plaintiff was an at-will employee. As a supervisor, she was often responsible for closing the store during the evening.

A. The Robbery

On Sunday, August 3, 2003, Plaintiff was in charge of closing the store. According to Plaintiff, she left the door to the manager's office open earlier in the evening so that the employees could bring their cash drawers into the office where the safe was located. (Martinelli Dep. at 77-78). Later on, Plaintiff asked her daughter, who was shopping in the store that evening, to close the office door. (*Id.* at 78-79).

At approximately 8:50 p.m. that evening, ten minutes before closing, Plaintiff and her six-year-old son, who was visiting her at the store that evening, walked toward the manager's office in the back of the store. Plaintiff was carrying a cash drawer from one of the registers. As Plaintiff unlocked the door and she and her son entered the office, a man held a gun to Plaintiff's head and ordered them into the office. (*Id.* at 85-86). The man forced Plaintiff to open the safe, which contained cash from the entire weekend.

After the robber fled, Plaintiff called 911. The total loss from the robbery was more than $17,000.

B. Plaintiff's FMLA Leave

Following the robbery, on August 4, 2003, Plaintiff took an approved medical leave

2

of absence. On August 18, 2003, Plaintiff's treating psychologist, Dr. Donald J. McEachran, submitted a letter to CVS's worker's compensation administrator, Judy Safford, indicating that Plaintiff was suffering from Posttraumatic Stress Disorder as a result of the robbery. On August 22, 2003, CVS notified Plaintiff that her leave of absence was protected by the FMLA and provided her with the "Statement of Your Rights Under the Family and Medical Leave Act of 1993." (Pl.'s Resp. Ex. 11).

On September 18, 2003, Dr. McEachran notified Safford that Plaintiff was able to return to work on a full-time basis commencing September 22, 2003, with the following restrictions: (1) no "closing" for 3 months; and (2) no shifts ending later than 8:00 p.m. for at least 2 months. On September 22, 2003, CVS returned Plaintiff to her position as shift supervisor at store #8028 with the restrictions, at the same compensation and benefits she had before she went on leave.

C. Plaintiff's Termination

Following the robbery, CVS initiated a loss prevention investigation headed by the district's loss prevention representative, Timothy Fulton. On August 4, 2003, Fulton interviewed all of the employees who had been working at store #8028 on the evening of August 3, 2003, except Plaintiff because she was on medical leave. According to Fulton, in general, when CVS employees are on approved leave, CVS does not require that they report to work for loss prevention investigations. (Fulton Aff. ¶7).

On September 17, 2003, CVS human resources manager, Edward Wayne Melton, sent an email to the District Manager, William Hensley, which provided, in part:

3

> An investigation revealed that Martinelli had violated several CVS policies which contributed to a significant financial loss for CVS. She failed to make the bank deposit. (I understand an AM from another store was in the building without keys. Therefore it was Martinelli's responsibility.) Also Martinelli failed to lock the manager's office. She had it proped [sic] open so a cashier could take her cash drawer to the office. Finally, she had a small child in the office during her work shift.
>
> I agreed with your decision to terminate her employment. I asked that she be allowed an explanation and for you to consider her explanation. If the issues are as presented than consistent with how we have handled other financial losses with violations of policy then she should be terminated.

(Pl.'s Mot. Ex. 15).

On September 22, 2003, Fulton met with Plaintiff. Plaintiff told Fulton that she left the door open for a non-management cashier to put her cash drawer in the office. (*Id.* at ¶8). Fulton concluded that leaving the door open was a big error by Plaintiff and that the robber was able to hide in the office to wait until closing.[1] Fulton shared his opinion with Hensley.

Hensley and Melton, decided to terminate Plaintiff's employment for gross violation of company policy. (Hensley Dep. at 87-94). On September 24, 2003, Hensley met with Plaintiff and gave her the following notice of termination:

> On 8/3/03 Brenda left the office door open allowing access to a person who committed an armed robbery of the store. This gross violation resulted in a $17,000 loss to CVS. This is in direct violation of company directives and procedures[.] Due to this gross violation and significant loss that occurred as a result of her negligence, Brenda [sic] employment with CVS will be terminated effective today 9/24/03.

(Def.'s Resp. Ex. E).

---

[1] The robber was a former employee of CVS.

4

D. CVS's Door Policy and Practice

CVS has a Store Management Development Program ("SMD Program"), which sets forth a number of store policies. According to Defendant, as a shift supervisor, Plaintiff was expected to follow CVS's SMD Program. The SMD Program training module 504000 states that, "[t]he office door is always locked and secured." (Def.'s Resp. Ex. A, Melton Aff. ¶6, and Ex. 3 thereto). Plaintiff was certified as trained on module 504000 prior to the robbery. (*Id.*). In addition, module 501800 states that, "[t]he Manager's office door is kept closed and fully locked at all times." (Def.'s Resp. Ex. A, Melton Aff. ¶7, and Ex. 4 thereto). Plaintiff was certified as trained on module 501800 prior to the robbery. (*Id.*).

Plaintiff, however, contends that she was not aware of any CVS policy requiring her to keep the manager's office door closed. According to Plaintiff, it was common practice to leave the door open during closing time. (Martinelli Dep. at 80). Plaintiff also contends that she did "exactly what I was trained to do by Dawn Wilder." (*Id.* at 144).[2]

**II. Standard of Review**

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving

---

[2]Dawn Wilder denies that she taught Plaintiff that "[i]t was okay to leave the door open and take in a drawer while you are going to get another drawer." (Wilder Dep. at 30, 31).

party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsishita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

**III.   Applicable Law and Analysis**

A. Count I: Plaintiff's Claim for FMLA Protection

The FMLA provides covered employees with certain substantive rights to unpaid leave, and makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempted exercise of such rights. 29 U.S.C. § 2615(a)(1). Plaintiff contends that Defendant denied Plaintiff her substantive rights under the FMLA by terminating Plaintiff within three days after she returned to work.

6

In this case, however, Plaintiff received all of the benefits to which she was entitled under the FMLA.  First, Plaintiff was permitted to take a leave of absence for her Posttraumatic Stress Disorder.  Second, Plaintiff remained on leave until her treating psychologist stated that she was able to return to work.  In addition, CVS restored Plaintiff to her former position with the restrictions set forth by Plaintiff's psychologist.

However, under the FMLA, an employee who requests leave or is on leave has no greater rights than an employee who remains at work.  *See* 29 C.F.R. § 825.216(a).  The FMLA does not protect individuals from termination for reasons unrelated to the leave itself.  *See, e.g.*, *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998).  Thus, an employee returning from FMLA leave is not entitled to restoration unless she would have continued to be employed had she not taken FMLA leave.  *Hoge v. Am. Honda Mfg.*, 384 F.3d 238, 245 (6th Cir. 2004).

In this case, Defendant returned Plaintiff to her position following her FMLA leave. After interviewing Plaintiff as part of its loss prevention investigation, Defendant made the final decision to terminate Plaintiff's employment.  Therefore, the Court does not believe that Defendant denied Plaintiff her substantive rights under the FMLA.


B.  Count II: Plaintiff's Claim that Defendant Retaliated Against her in Violation of the FLMA

Plaintiff contends that Defendant's decision to terminate Plaintiff's employment was in retaliation for her FMLA leave.  A retaliation claim under the FMLA is analyzed under the burden-shifting framework used in Title VII claims, which was originally

7

articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981). *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

Under this framework, Plaintiff first has the burden of proving, by a preponderance of the evidence, a prima facie case of retaliation. *See Burdine*, 450 U.S. at 252-53, 101 S. Ct. at 1093. Plaintiff may meet this burden by showing that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

If Plaintiff establishes a prima facie case, Defendant must then articulate a legitimate, non-retaliatory reason for discharging Plaintiff. *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 731 (6th Cir. 2000). To meet its burden, Defendant "must clearly set forth, through the introduction of admissible evidence, the reasons . . ." for the discharge. *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. Should Defendant carry this burden, Plaintiff must then have an opportunity to prove by a preponderance of the evidence, that Defendant's stated reason is pretext for unlawful retaliation under the FMLA. *Id.* at 253, 101 S. Ct. at 1093.

In this case, the Court does not believe that Plaintiff can establish a prima facie case of retaliation. Although it is undisputed that Plaintiff availed herself of protected rights under the FMLA and that Plaintiff's employment was terminated, Plaintiff has failed to

8

show that there is a causal connection between her FMLA leave and her termination. Plaintiff has failed to present any evidence to the Court that her termination was motivated by her FMLA leave or the restrictions placed on her employment once she returned to work.

In addition, even assuming *arguendo* that Plaintiff could establish a prima facie case of retaliation, Plaintiff cannot show pretext. Defendant has consistently asserted that Plaintiff was terminated for leaving the manager's office door open, which resulted in a robbery. Whether the robbery would have occurred even if she had followed the policy, is not for the Court to decide. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"). Rather, the Court's inquiry "is limited to whether the employer gave an honest explanation of its behavior." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994) (quotation omitted).

In this case, the Court believes that Defendant terminated Plaintiff for violating the door policy. Although Plaintiff may not remember learning about such a policy, Defendant has offered proof that Plaintiff completed training modules relating to the door policy. (Def.'s Resp. Ex. A, Melton Aff. ¶¶6-7, and Exs. 3-4 thereto). In addition, in Plaintiff's written statement she made on September 22, 2003, pursuant to the loss prevention investigation, she wrote: "A lot of lessons learned because of this. Never leave door open for anyone . . . ." (Def.'s Resp. Ex. B). In any case, Plaintiff's alleged lack of knowledge does not establish that CVS's reason for her termination was pretextual. *See Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407-08 (6th Cir. 2003).

9

Furthermore, Defendant had terminated a store manager for violation of company policy in November 2002.  According to Defendant, following a robbery in which approximately $19,000 was stolen, the store manager gave a statement to loss prevention admitting to a violation of company policy by failing to make several bank deposits.  Defendant terminated the manager's employment.  (Melton Aff. ¶26).  Finally, other CVS employees who were victims of robberies, but did not violate any company policy that contributed to the loss, who took leaves of absence were able to return to their former positions without adverse consequences.  (Melton Aff. ¶25).

Plaintiff contends that Defendant had a "custom" of keeping the door open during closings so that cashiers could bring their doors into the manager's office.  In support of this argument, Plaintiff has submitted her own testimony, as well as affidavits from two others that it was Defendant's custom to keep the door open.  (*See* Resp. Ex. 6, Decl. Kimberly Keresi; Ex. 7, Decl. Paula Russell; and Ex. 8, Decl. Brenda Martinelli).  According to Plaintiff, "[a]t the store location where I worked, the safe-room door had always been left open as a matter of policy and practice when the store was in the process of closing.  I was trained to close the store in this way by the store manager, Dawn Wilder."  (Martinelli Decl. ¶8).  Wilder, however, testified that the procedure for bringing cash drawers to the manager's office required that the door be closed and locked.  (Def.'s Resp. Ex. G, Wilder Dep. at 28-29).  Wilder also testified that it was not okay to put a cash drawer in the office and then leave the office open to go get another cash drawer.  (*Id.* at 29-31).  According to Wilder, it was CVS's policy that the manager's office door

10

had to be closed and locked.  (*Id.* at 29).

Kimberly Keresi, a customer at the CVS pharmacy where Plaintiff worked in 2002 and 2003, testified: "[d]uring . . . visits, it was not uncommon for me to personally socialized [sic] and visit with both Dawn Wilder and Brenda Martinelli in an office located in the back of that store.  When we were not in the back office room, the door to the room remained visibly open."  (Keresi Decl. ¶¶2-3).  However, Keresi was merely a customer, not an employee who would have knowledge of a store's customary practice.

Paula Russell, an employee who worked at the CVS pharmacy where Plaintiff worked in 2000 and 2001, testified: "[i]t was the usual and customary practice of the store managers during that time period to leave the door to the manager's office open for approximately fifteen minutes before the store closed."  (Russell Decl. ¶5).  However, Russell was no longer an employee at the store at the time the robbery occurred in 2003.

Furthermore, Plaintiff has failed to present the Court with any evidence that Hensley or Melton, the individuals who were involved with the termination of Plaintiff's employment, were aware of this alleged custom of leaving the manager's door open during closing.  Hensley testified that he made the ultimate decision to terminate Plaintiff's employment, after some discussion with Melton.  (Def.'s Resp. Ex. D, Hensley Dep. at 89; *see also* Def.'s Resp. Ex. A, Melton Aff. ¶20 ("In consultation with me, Hensley made the final decision to terminate Plaintiff's employment for gross violation of company policy.")).

Hensley testified:

Q. Have you ever seen an office door open like that before when you've walked

11

into a CVS pharmacy on your review day?

A. I don't recall. I think it is a very clear expectation that we have.

(Def.'s Ex. D, Hensley Dep. at 96.)

With respect to the decision to terminate Plaintiff, Hensley testified, "In reviewing the statement that Brenda made to Tim Fulton, the conclusion I reached was that, based on actions that Brenda took, she violated policy and procedures, and the determination was made to terminate the employment." (*Id.* at 68).

In addition, while Plaintiff was on FMLA leave, but before Fulton interviewed her, Melton contends that he spoke with Hensley and discussed his understanding of the circumstances surrounding the robbery:

> It was my understanding at that time that Plaintiff had (1) left the manager's door open and unlocked so that a cashier could put her cash drawer in the office, (2) [had] her son in the office during cash closing procedures, and (3) failed to make any deposit of money during that workday. Each of these issues was a violation of CVS policy and procedure. . . .

(Def.'s Resp. Ex. A, Melton Aff. ¶12). Moreover, after Plaintiff gave Fulton her statement admitting to a number of errors during the closing procedures–including admitting to leaving the manager's door open–Melton stated: "My understanding of Plaintiff's statement during the loss prevention interview confirmed my belief that Plaintiff's conduct violated the CVS policy." (*Id.* at ¶19).

In reviewing the record in this case, there is simply no credible evidence that Defendant retaliated against Plaintiff in violation of the FMLA.

C. Count III: Plaintiff's Emotional Distress Claim

To establish a claim of intentional infliction of emotional distress, a plaintiff must

12

show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.  *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (2000).  Because Plaintiff's claim arises out of her employment with CVS, the second element is modified in light of the exclusive remedy provision of the Michigan's Worker's Disability Compensation Act ("WDCA"), MICH. COMP. LAWS ANN. § 418.131.  *See Graham*, 237 Mich. App. at 673, 604 N.W.2d at 716.  Under the WDCA exclusive remedy provision, Plaintiff must prove that a management-level employee of CVS "specifically intended . . . [her] injury."  *Id.*

In this case, no reasonable juror could find that Defendant's conduct in terminating Plaintiff because CVS management believed that Plaintiff's violation of a CVS policy contributed to the robbery and resultant $17,000 loss was extreme or outrageous.  Therefore, Plaintiff's claim for intentional infliction of emotional distress must be dismissed.

  D.  Count IV: Plaintiff's PWDCRA Claim

In Count IV of Plaintiff's First Amended Complaint, she states: "**In the event** the defendant-employer argues during this particular case that the plaintiff was not able to perform the essential functions of her job (even though the plaintiff worked for three days before being terminated), the plaintiff is **alternatively** protected by the PWDCRA as she was *a person with a disability* within the meaning of the statute."  (First Am. Compl. ¶64 (bold-faced emphases added)).

In this case, Defendant has not alleged that Plaintiff was not able to perform the essential functions of her position.  Therefore, this alternative theory of liability shall be

13

dismissed.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

                                    s/PATRICK J. DUGGAN
                                    UNITED STATES DISTRICT JUDGE

Copies to:
Stanley H. Pitts, Esq.
Raymond S. Sakis, Esq.